Lund, et al. v. Citizens                CV-97-183-M    09/30/99
                    UNITED STATES DISTRICT COURT

                      DISTRICT OF NEW HAMPSHIRE


Richard Lund and John L. Claps,
      Plaintiffs

      v.                                      Civil No. 97-183-M

Citizens Financial Group, Inc. and
Citizens Bank New Hampshire,
      Defendants


                         **O R D E R**


      Plaintiffs Richard Lund and John L. Claps challenge

defendants' repudiation of rights they claim under a Supplemental

Executive Retirement Plan ("SERP") allegedly established by their

former employer (and defendants' predecessor), First NH Bank.[1]

Plaintiffs' amended complaint[2] asserted state law claims based on

contract, breach of the implied duty of good faith and fair

dealing, promissory estoppel, common law breach of fiduciary

duty, common law fraud, common law negligent misrepresentation

and, in the alternative, federal counts under the Employee

Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq.

("ERISA"), for recovery of benefits due under the SERP, see 29

_____

      [1]First NH Bank and its successors are sometimes hereinafter
referred to as "the bank."

      [2]Suit was originally filed in State court and removed to
this court pursuant to 28 U.S.C. §§ 1441 and 1446.

U.S.C.A. § 1132(a)(1)(B)(West 1999), and breach of fiduciary duty. Plaintiffs also brought a claim seeking declaratory judgment.

By order dated June 25, 1998, the court dismissed plaintiffs' state law claims as preempted by ERISA, and dismissed the federal law breach of fiduciary duty claim because the alleged SERP is a "top hat" plan exempt from ERISA's fiduciary duty requirements.[3] Plaintiffs' remaining claims - Count VII, seeking recovery of benefits due under the SERP, and Count IX, seeking declaratory judgment - were tried to the court. On November 16, 1998, a hearing was held on pending motions in limine. The court resolves all outstanding motions and rules on plaintiffs' remaining claims on the merits as follows.

## Background

The court finds that the following facts were proved at trial. From September, 1982, through 1990, Plaintiff Lund was employed as the president and Chief Executive Officer ("CEO") of Exeter Banking Company, a wholly owned subsidiary of First NH Bank. He thereafter held a number of commercial lending

---

[3]A "top hat" plan is "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C.A. § 1101(a)(1) (West 1999).

management positions with First NH Bank until he left the bank's employ in 1995. Plaintiff Claps was employed as a vice president, and soon thereafter senior vice president, of Merchants National Bank of Manchester, New Hampshire, from May, 1981, to November, 1986. He then served as president, CEO and director of First NH Investment Services until he left the bank in August, 1995.

In the latter part of 1986 or early 1987, Joseph DeAngelis, the bank's senior vice president of human resources,[4] and Frank O. Buhl, the bank's CEO, began developing a SERP in response to the Tax Reform Act of 1986. The Tax Reform Act of 1986 limited benefits that could be provided to certain highly compensated employees under the bank's qualified defined benefit pension plan. The bank sought to restore those benefits through a SERP.

Between May and July of 1987, the bank retained actuary Charles Commander and attorney Alan Cleveland to assist in developing the SERP. DeAngelis instructed Attorney Cleveland to draft a SERP in accordance with a list of principal plan provisions prepared by Mr. Commander. (Pls.' Ex. 1.) At some point prior to August 25, 1987, DeAngelis presented the personnel committee of the bank's board of directors with a concept, or

---

[4]DeAngelis was vice president of human resources prior to January, 1987, and senior vice president of human resources thereafter.

3

design, for the SERP that the personnel committee approved.  On August 25, 1987, the chairman of the personnel committee brought the concept or design, the terms of which are now either disputed or unclear, before the bank's board of directors.  The board then voted to adopt a SERP.[5]  At the time, however, no actual written plan existed.  A written plan draft was not circulated until about a year later, on June 10, 1988, and was not finalized until February of 1989.

First NH Bank was acquired by the Bank of Ireland in 1988.  On April 26, 1988, a meeting was held at the Sheraton Wayfarer Hotel in Bedford, New Hampshire, to discuss the impending acquisition with the bank's employees.  The first part of the meeting addressed participants in the bank's stock option plan, who were told that the Bank of Ireland would redeem their outstanding stock options at net value when the acquisition was completed.  The employees were asked to sign a document memorializing their agreement not to exercise stock options prior to the acquisition by Bank of Ireland.

---

[5]Testimony regarding the board's action on the proposed SERP conflicted.  Lund, who was at the board meeting, testified that the board voted to adopt the intention to adopt a SERP. DeAngelis, who was not at the meeting, testified to his understanding that the board voted to adopt a SERP in accordance with the design or concept presented.

The second part of the meeting involved a smaller group, consisting of senior officers of First NH Bank and the presidents of each of the bank's subsidiaries. DeAngelis told this smaller group that the bank had approved a SERP in which they were participants. Under the terms of the plan as described at the meeting, participants would be eligible for full retirement benefits at age 62, or, could take a reduced early retirement benefit at age 55. The maximum benefit, available at age 62, would be calculated as the average of the participant's five highest years' salary, multiplied by 60 percent, minus amounts payable to the participant under the bank's qualified benefit plan, Social Security, and other pension plans. Early retirement benefits would be reduced according to the same formula used in the bank's qualified benefits plan. In fact, DeAngelis believed, and expressly told the attendees of the meeting, that the SERP was designed to track the bank's qualified benefits plan. Thus, the plan described at the meeting, like the qualified benefits plan, offered a deferred vested benefit, meaning that once the benefit vested, it was payable upon the participant's reaching retirement age even if he or she had previously left the bank's employ. As described to the participants in April, 1988, the SERP benefit vested with ten years of service. The participants were not told that they would lose their SERP benefits if they

later competed with the bank in someone else's employ. They were told that a written plan was not yet available but would be forthcoming.

On June 10, 1988, after the meeting, Attorney Cleveland forwarded to DeAngelis a first written draft of the SERP which DeAngelis forwarded in turn to Mr. Commander, possibly without reading it. Under the terms of the written draft, a participant had to remain employed by the bank through retirement to be eligible for the SERP benefits. The draft also contained a "bad boy clause" providing for forfeiture of benefits if the participant went to work for a competitor of the bank. Mr. Commander returned the draft with comments which, after discussing them with DeAngelis, Attorney Cleveland largely incorporated into the written plan. The final draft was completed in February of 1989.

There is no evidence that the bank's board of directors ever formally considered or approved or adopted the written embodiment of the SERP. However, a document purporting to be "[t]he First NH Banks, Inc. Supplemental Executive Retirement Plan, established as of August 25, 1987," (Defs.' Ex. 1)(the "1987 written SERP"), was kept as a business record of the bank and treated and administered by the bank's personnel department as an operative plan. That plan provided that a participant would

forfeit his rights under the plan if, _inter alia_, either of the following events occurred:

> Executive engages in any activity or conduct which, in the opinion of the Bank, is directly or indirectly competing against any business engaged in by the Bank or any of its Affiliates or subsidiaries; or
> . . .
> Executive terminates employment with the Bank or its Affiliates or subsidiaries for any reason, including his or her death but excluding termination by reason of disability as defined under Section IV hereunder, prior to the date Executive both attains age 55 years and completes 10 years of service with the Bank or its Affiliates.

(Defs.' Ex. 1 at 6-7.)

Another document titled Bank of Ireland First Holdings, Inc. Supplemental Executive Retirement Plan (SERP), purporting to be an amendment of the previous document and stamped "Approved Jan 28 1993," was also kept in the bank's records and implemented by the personnel department as the bank's SERP. (Defs.' Ex. 2.) Finally, a Bank of Ireland Group U.S. Supplemental Executive Retirement Plan, purporting to be effective as of January 1, 1995, was similarly kept and administered by the bank. Each of these plans also provided for forfeiture of benefits if the participant competed with the bank or terminated employment under other than specified circumstances.

Following the April 26 Sheraton Wayfarer meeting, plaintiffs and others repeatedly requested copies of the written SERP from the bank and were repeatedly told that it was not yet available.

7

In late 1990, Lund again requested a copy, as he was undergoing a divorce and needed to provide information about his retirement benefits. Kim Lee, DeAngelis' successor, sent him a two page summary of the principal plan provisions. The terms therein were consistent with Lund's recollection of the SERP described in 1988, except for the addition of a new term providing that the "[b]enefit is pro-rated if the participant has less than 20 years of service." (Pls.' Ex. 1.) Lund forwarded the document to Claps in early 1991.

Claps completed ten years of service with the bank in May of 1991. Lund completed his tenth year of service on September 20, 1992.

In early 1993, plaintiffs asked either Jane Shea-Seitz, Ms. Lee's successor, or Ann McArdle, the bank's Senior Vice-President for Compensation and Benefits, to meet with them to discuss the SERP. A meeting was held at the bank's offices in Concord, New Hampshire. Plaintiffs, Ms. McArdle, plan participant Mike Kirk, and Attorney Cleveland attended.[6] Plaintiffs and Mr. Kirk

---

[6]Plaintiffs testified that Ms. Shea-Seitz also attended the meeting, but Ms. McArdle testified that she did not. Ms. McArdle's memorandum to Ms. Shea-Seitz describing a meeting on April 13, 1993, appears to confirm her testimony. It is possible that more than one meeting occurred, as plaintiffs' memoranda to Ms. Shea-Seitz, which they testified she requested at the meeting, are dated somewhat later than April (Claps' memorandum is dated June 7, 1993; Lund's is dated June 9, 1993). (Pls.' Ex. 13.) Mr. Kirk, who also thought Ms. Shea-Seitz attended the

described the SERP as they understood it and were given copies of the 1987 "plan" and its 1992 "revision." Each was then or later[7] asked to write a memorandum to Ms. Shea-Seitz setting forth his understanding and position regarding the SERP. Ms. McArdle told plaintiffs and Mr. Kirk that she would research the matter and forward her findings to Terry Forsythe, group corporate secretary for the Bank of Ireland in Dublin.

In early 1994, plaintiffs were informed that the Bank of Ireland did not agree with their interpretation of the SERP. Ms. McArdle probably told the plaintiffs at the time that if they disagreed with that determination, they could pursue the matter further with Mr. Forsythe either directly or through Ms. Shea-Seitz. Lund testified that he asked for something in writing, but only received a memorandum from Ms. Shea-Seitz confirming that his participation in the SERP was grandfathered and that a benefit calculation would be prepared for him.[8] Lund testified that he never received the promised benefit calculation.

---

meeting, submitted a memorandum dated July 22, 1993) <u>Id</u>.

[7] <u>See</u> <u>supra</u> note 6.

[8] In late 1990, when First NH Bank merged most of its affiliate banks, Lund's position as CEO of an affiliate bank terminated. Arguably, therefore, he would no longer have been a participant in the SERP. Ms. She-Seitz's memorandum confirmed that the bank nevertheless considered Lund an eligible participant.

Both plaintiffs left the bank's employ in 1995, after having worked more than ten years for the bank, but prior to reaching age 55. Lund became president and CEO of Farmington National Bank in Farmington, New Hampshire. Claps went to work for Northern Trust Corporation as a senior vice president of one of its subsidiaries, Northern Trust Bank of Arizona. In connection with terminating his employment, Claps negotiated and executed a severance agreement with the bank under which he continued to receive his salary through August, 1996, as well as other benefits. In exchange, Claps agreed to fully release the bank, its successors and related persons from all claims, demands and causes of action then existing.

On March 5, 1996, Lund's counsel wrote to Ms. McArdle requesting a "clear statement" of the bank's position on Lund's rights under the SERP. (Pls.' Ex. 18.) At some point thereafter, the bank denied plaintiffs' entitlement to any benefits under the SERP. Plaintiffs then brought suit by writ dated March 7, 1997.

Standard of Review

"A district court reviews ERISA claims arising under 29 U.S.C. § 1132(a)(1)(B) de novo unless the benefits plan in question confers upon the administrator discretionary authority

to determine eligibility for benefits or to construe the terms of the plan." Rodriguez-Abreu v. Chase Manhattan Bank, N.A., 986 F.2d 580, 583 (1st Cir. 1993)(internal quotations and footnote omitted). The 1987 written SERP document grants the bank the power to interpret and construe the terms of the SERP. (See Defs.' Ex. 1.) It was not proven at trial, however, that the SERP as embodied in that document was ever officially adopted by the bank's board of directors. Indeed, it seems likely that it never was. Moreover, the document was not disclosed to plaintiffs until 1993, well after plaintiffs had vested under the terms of the SERP as orally described to them.

Plaintiffs are not bound by the discretionary authority reserved to the bank in a document that the bank's board apparently never approved, and which was never timely disclosed to them. See Bartlett v. Martin Marietta Operations Support, Inc. Life Ins. Plan, 38 F.3d 514, 517 (10th Cir. 1994)(holding that the district court properly employed de novo standard of review, and ignored language in a summary plan description ("SPD"), when the SPD had not been printed until after plaintiff's death and the only document made available to employees prior to that date did not reserve discretionary authority). The court therefore applies a de novo standard of review.

<u>Discussion</u>

I.  <u>Pending Motions</u>

On the evening before the first day of trial, defendants filed a number of motions in limine on which the court deferred ruling.  Each motion will be addressed in turn.

A.  <u>Defendants' "Motion in Limine" Concerning Statute of Limitations</u>.

Defendants' first "motion in limine" actually seeks dismissal of plaintiffs' claims as barred by the statute of limitations.  Defendants argue that Plaintiffs' Exhibits 5, 10 and 11 show that plaintiffs were aware of the claims asserted in this action by April, 1993, and that those claims are therefore barred by the applicable three-year statute of limitations.  N.H. Rev. Stat. Ann. § 508:4, I (1997).

Plaintiffs object on both procedural and substantive grounds.  First, plaintiffs argue that notwithstanding the appellation "motion in limine," defendants' motion is actually one to dismiss or for summary judgment, and as such, is untimely.  Under the pretrial scheduling order adopted by the court on May 16, 1997, the deadline for filing a motion to dismiss was September 1, 1997, and for filing motions for summary judgment was June 1, 1998.  Moreover, plaintiffs argue that defendants

12

waived any statute of limitations defense by failing to plead it in their answer.

Federal Rule of Civil Procedure 8(c) requires that "[i]n pleading to a preceding pleading, a party shall set forth affirmatively . . . statute of limitations . . . and any other matter constituting an avoidance or affirmative defense." Thus, all affirmative defenses must be pleaded in the defendants' answer. McKinnon v. Kwong Wah Restaurant, 83 F.3d 498, 505 (1st Cir. 1996). "Affirmative defenses not so pleaded are waived." Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp., 15 F.3d 1222, 1226 (1st Cir. 1994). The court accepted defendants' late-filed answer on August 25, 1998. Defendants were then permitted to amend their answer on September 21, 1998. Neither pleading raised the statute of limitations as an affirmative defense. Nor did defendants assert the statute of limitations in their pretrial statement or trial memorandum filed on September 9, 1998. Accordingly, the defense has been waived by counsel's failure to assert it in a timely fashion.

Even if the defense had not been waived, however, defendants failed to prove it either before or at trial. ERISA does not provide a statute of limitations for actions brought under 29 U.S.C. § 1132(a)(1)(B) to recover benefits or clarify rights to future benefits. Courts therefore apply the most analogous state

13

statute of limitations.  See <u>Union Pacific R.R. Co. v. Beckham</u>, 138 F.3d 325, 330 (8th Cir. 1998).  Federal common law, however, determines when a claim accrues.  See <u>id.</u>; <u>Northern Cal. Retail Clerks Unions and Food Employers Joint Pension Trust Fund v. Jumbo Markets</u>, 906 F.2d 1371, 1372 (9th Cir. 1990).

The most analogous New Hampshire statute of limitations is that governing personal actions, including breach of contract: N.H. Rev. Stat. Ann. § 508:4, I.  See <u>Black Bear Lodge v. Trillium Corp.</u>, 136 N.H. 635, 637 (1993) (contract actions governed by N.H. Rev. Stat. Ann. § 508:4, I); <u>Harrison v. Digital Health Plan</u>, 1999 WL 595392, at *3 (11th Cir. Aug. 9, 1999)(noting that "almost without exception, federal courts have held that a suit for ERISA benefits pursuant to section [1132(a)(1)(B)] should be characterized as a contract action for statute of limitations purposes").  That statute provides a three year limitations period:

> Except as otherwise provided by law, all personal actions, except actions for slander or libel, may be brought only within 3 years of the act or omission complained of, except that when the injury and its causal relationship to the act or omission were not discovered and could not reasonably have been discovered at the time of the act or omission, the action shall be commenced within 3 years of the time the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the injury and its causal relationship to the act or omission complained of.

N.H. Rev. Stat. Ann. § 508:4, I (1997).

14

Generally, a cause of action for benefits under ERISA accrues when a claim for benefits has been formally denied, see Beckham, 138 F.3d at 330, and the employer's appeals process has been exhausted, see Thomas v. Eastman Kodak Co., 1999 WL 487158, at *10 (1st Cir. July 15, 1999) (contrasting Title VII with ERISA). Nevertheless, some courts have held that "an ERISA beneficiary's cause of action accrues before a formal denial, and even before a claim for benefits is filed, when there has been a repudiation by the fiduciary which is clear and made known to the beneficiary." Beckham, 138 F.3d at 330 (internal quotation marks and brackets omitted).

Defendants argue that Plaintiffs' Exhibits 5, 10 and 11 show that plaintiffs were aware of their ERISA claims no later than April, 1993. Restated in terms of Beckham, defendants' argument is that by April, 1993, plaintiffs knew that the bank had repudiated their interpretation of the SERP. Plaintiffs counter that their Exhibits 5, 10 and 11 actually show that the bank was still investigating their claims in 1993, and therefore, no clear repudiation had been communicated to them. The court agrees. Plaintiffs' Exhibit 5 is a memorandum dated April 26, 1993, from Ms. McArdle to Ms. Shea-Seitz reporting on an April 13, 1993, meeting with the plaintiffs and Mr. Kirk. The memorandum confirms that at the meeting, Ms. McArdle provided the plaintiffs

15

with copies of the 1987 and 1992 SERP-related documents, which would have notified plaintiffs that written documents describing terms contrary to their understanding of the SERP existed. However, the memorandum also states that Ms. McArdle "asked Rick, John and Mike to give [her] some time to research the matter." (Pls.' Ex. 5.)  Thus, no clear repudiation of benefits was conveyed to plaintiffs at the April 13, 1993, meeting.

Plaintiffs' Exhibits 10(ID) and 11 are memoranda to Ms. Shea-Seitz from Claps and Lund, respectively, detailing their position regarding their SERP claims, particularly relating what they had been told on April 7, 1988.  Both memoranda, written in June of 1993, confirm that plaintiffs had recently been informed that the written SERP documents provided, contrary to their understandings, that to be eligible for benefits, a participant had to be employed by the bank at retirement and could not compete with the bank.  However, Ms. Shea-Seitz's very request that plaintiffs prepare the memoranda demonstrates that the bank was still looking into the matter and considering the merits of their claims.  The memoranda do not document a clear repudiation of benefits by the bank.

The evidence presented at trial established that plaintiffs were told that the bank would look into the matter and forward the results of its investigation up the chain of command to the

Bank of Ireland, where the actual decision regarding SERP benefits would be made. Lund testified that he called Ms. McArdle in early 1994, and was told that the Bank of Ireland did not agree with plaintiffs' position regarding SERP benefits. Although Lund could not recall exactly when that conversation took place, he testified that it was prior to his receipt of a memorandum from Ms. Shea-Seitz dated March 8, 1994. Thus, the conversation with Ms. McArdle most likely took place before March 7, 1994, which is three years prior to the date of plaintiffs' writ. If that conversation started the limitations period running, plaintiffs' suit would be time-barred.

The court finds, however, that the conversation did not start the limitations period. Accrual of a cause of action under 29 U.S.C. § 1132(a)(1)(B) requires a "clear and unequivocal repudiation of rights under the pension plan which has been made known to the beneficiary." Daill v. Sheet Metal Workers' Local 73 Pension Fund, 100 F.3d 62, 66 (7th Cir. 1996). Ms. McArdle testified that she believes she told plaintiffs and Mr. Kirk that "the initial response from Bank of Ireland was that they didn't see any merit to what they were talking about." She also stated that although she did not "recall specifically what happened[,] [she] would have said to them as to anybody else if you still

17

disagree, then feel free to pursue it either with Terry Forsythe directly or through Jane Shea-Seitz."

Ms. McArdle's informal transmittal of an "initial response" from the Bank of Ireland, accompanied by an explicit invitation to pursue the matter further if dissatisfied, did not constitute a "clear and unequivocal repudiation." <u>Daill</u>, 100 F.3d at 66.

> A plan or insurer that informs a claimant that his benefits have been denied, but that he has a right to appeal, has not clearly and unequivocally repudiated its obligation, and a claimant would not automatically conclude that it had. The initial denial signals to the claimant merely that [he] should appeal, not that [he] should file suit immediately. So long as internal remedies are available to the plaintiff, the possibility remains that the insurance company or plan will grant the claim - i.e., there has been no final decision and resort to court is premature.

<u>Mitchell v. Shearson Lehman Bros., Inc.</u>, 1997 WL 277381, at *3 (S.D.N.Y. May 27, 1997); <u>see</u> <u>also</u> <u>Salcedo v. John Hancock Mut. Life Ins. Co.</u>, 38 F. Supp. 2d 37, 43 (D. Mass. 1998)("Time spent in pursuing internal appeals should not be charged to the plaintiff, for there has been no unequivocal repudiation of a plaintiff's right to benefits until the review is concluded."). But <u>see</u> <u>Patterson-Priori v. Unum Life Ins. Co. of America</u>, 846 F. Supp. 1102 (E.D.N.Y. 1994) (holding that cause of action accrued at time of initial termination of benefits despite notification of right to appeal).

18

The evidence at trial did not conclusively show when the bank "clearly repudiated" plaintiffs' eligibility for SERP benefits. Lund's testimony indicates that unequivocal denial was probably communicated by letter from Attorney Cleveland to plaintiffs' counsel some time after March, 1996.[9] In any event, the court finds that clear repudiation was not communicated prior to March 7, 1994. Thus, plaintiffs' suit was timely filed. Defendants' "Motion in Limine" Concerning Statute of Limitations is denied.

B.   Defendants' Motion in Limine Concerning Equitable Estoppel Claims Not Pled

Defendants' second motion in limine argues that plaintiffs should not be permitted at trial to introduce or argue a theory of equitable estoppel because they failed to plead such a claim in their complaint. Plaintiffs counter that under the Federal Rules of Civil Procedure, a complaint need not expressly describe the legal theories on which a claim is based. The court agrees.

> The "theory of the pleadings" doctrine, under which a complaint must proceed upon some definite theory and plaintiff must succeed on that theory or not succeed at all, has been all but abolished under the federal rules. Thus, under Fed.R.Civ.P. 8 it is not necessary that a legal theory be pleaded in the complaint if

_____

[9]Plaintiffs' counsel indicated at the post-trial motions hearing that he believed the letter was received in November, 1996.

> plaintiff sets forth sufficient factual allegations to state a claim showing that he is entitled to relief under some viable legal theory.

Fitzgerald v. Codex Corp., 882 F.2d 586, 589 (1st Cir. 1989) (citations and internal quotation marks omitted). The First Circuit has been especially hesitant to use technical pleading requirements to defeat claims in the ERISA context. See Degnan v. Publicker Indus. Inc., 83 F.3d 27, 30 (1st Cir. 1996) ("ERISA is a remedial statute designed to fashion anodynes that protect the interests of plan participants and beneficiaries. Courts should not hasten to employ technical rules of pleading and practice to defeat that goal." (citations omitted)).

Although our court of appeals has not yet decided whether to recognize an ERISA estoppel claim, see City of Hope Nat'l Med. Ctr. v. Healthplus, Inc., 156 F.3d 223, 230 n.9 (1st Cir. 1998), it has noted that the claim "allows recovery upon a showing of (1) a representation of fact made to the plaintiff; (2) a rightful reliance thereon; and (3) injury or damage to plaintiff resulting from a denial of benefits by the party making the representation," Cleary v. Graphic Communications Int'l Union Supplemental Retirement and Disability Fund, 841 F.2d 444, 447 (1st Cir. 1988). See also Law v. Ernst & Young, 956 F.2d 364, 368 (1st Cir. 1992) (describing elements of an estoppel claim). Plaintiffs' amended complaint alleges that the bank represented

20

to plaintiffs that under the terms of the SERP being offered to them they would become vested after ten years of service without having to be employed by the bank until retirement and without having to agree not to compete with the bank. (Compl. at ¶ 10.) The complaint alleges that in reliance on the bank's promises regarding the SERP, plaintiffs refrained from exercising stock options, as desired by the bank, and they remained with the bank through the Bank of Ireland acquisition and until they had completed more than ten years of service, foregoing other job opportunities. (Compl. at ¶ 16.) Finally, plaintiffs allege that they have suffered or will suffer damage as a result of defendants' denial of their eligibility for benefits under the SERP. (Compl. at ¶ 70.) Thus, plaintiffs pled sufficient facts to put defendants on reasonable notice of a potential estoppel claim against them. Defendants' Motion in Limine Concerning Equitable Estoppel Claims Not Pled is denied.

C.   Defendants' "Motion in Limine" Seeking Order That Plaintiffs' Claims [are] Barred by the Statute of Frauds.

Defendants' third "motion in limine"[10] argues that plaintiffs' claims are barred by the statute of frauds and must

_____

[10]The court notes that although this motion is titled a motion in limine, it is actually a motion to dismiss that is untimely under the court's scheduling order.

21

be dismissed. Specifically, defendants argue that the alleged SERP is a contract that could not by its terms be performed within a year and is therefore unenforceable under N.H. Rev. Stat. Ann. § 506:2 (1997) unless it is "in writing and signed by the party to be charged." Defendants' reliance on N.H. Rev. Stat. Ann. § 506:2 is misplaced. Under 29 U.S.C.A. § 1144(a) (West 1999), the provisions of subchapters I and III of ERISA "supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title." Thus, New Hampshire's statute of frauds is inapplicable to the SERP. See Ludwig v. NYNEX Serv. Co., 838 F. Supp. 769, 799 n.47 (S.D.N.Y. 1993) (noting that the court "regards the defendants' affirmative defense of the Statute of Frauds under New York law as being inconsistent with Congress's imprimatur for the courts to develop a federal common law of ERISA"); cf. Nash v. Trustees of Boston Univ., 946 F.2d 960, 964 (1st Cir. 1991) (assuming, without deciding, "that state law contract principles are preempted under ERISA"). But see Rockney v. Pako Corp., 734 F. Supp. 373, 382-83 (D. Minn. 1988), aff'd, 877 F.2d 637 (8th Cir. 1989)(adopting Minnesota's statute of frauds as the federal rule of decision in an ERISA case to provide alternative basis for granting summary judgment).

22

It does not appear that federal common law would impose a statute of frauds principle in this case. The First Circuit has noted that "Congress specifically contemplated that federal courts, in the interests of justice, would engage in interstitial lawmaking in ERISA cases in much the same way as the courts fashioned a federal common law of labor relations under section 301 of the [Labor-Management Relations Act]." Kwatcher v. Massachusetts Serv. Emp. Pension Fund, 879 F.2d 957, 966 (1st Cir. 1989). Interstitial lawmaking is unwarranted, however, where the issue is addressed by the statute itself. See Bigda v. Fischbach Corp., 898 F. Supp. 1004, 1016 (S.D.N.Y. 1995) (observing that "[t]he failure of ERISA to provide nonforfeitability coverage to top hat plans is not an 'interstice'" in the statute but purposeful omission).

ERISA generally requires an employee benefit plan to be embodied in a written instrument: "Every employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C.A. § 1102(a)(1) (West 1999).[11] Top hat

_____

[11]Some courts have concluded that because of the location of the writing requirement within the ERISA statute, a plan need not be written to be enforceable under ERISA. The court in Donovan v. Dillingham, 688 F.2d 1367, 1372 (11th Cir. 1982)(en banc), for instance, stated:

There is no requirement of a formal, written plan in either ERISA's coverage section, ERISA [§] 4(a), 29 U.S.C. [§] 1003(a), or its definitions section, ERISA

plans, however, are exempt from this requirement as they are excluded from the portion of ERISA (Subchapter I, Subtitle B, Part 4) that imposes it. <u>See</u> 29 U.S.C.A. § 1101(a)(1). Therefore, "top hat agreements can be partially or exclusively oral." <u>In re New Valley Corp.</u>, 89 F.3d 143, 149 (3d Cir. 1996). Because the statute itself answers whether a top hat plan must be in writing, the court cannot fashion a federal common law statute of frauds principle that would provide a different answer. <u>Cf.</u> <u>Bigda</u>, 898 F. Supp. at 1016 ("Since ERISA intentionally omits top hat plans from its nonforfeitability protection, federal common law may not be used to create nonforfeitability protection under

> [§] 3(1), 29 U.S.C. [§] 1002(1). Once it is determined that ERISA covers a plan, the Act's fiduciary and reporting provisions do require the plan to be established pursuant to a written instrument, ERISA [§§] 102 and 402, 29 U.S.C. [§§] 1022 and 1102; but clearly these are only the responsibilities of administrators and fiduciaries of plans covered by ERISA and are not prerequisites to coverage under the Act. Furthermore, because the policy of ERISA is to safeguard the well-being and security of working men and women and to apprise them of their rights and obligations under any employee benefit plan, see ERISA [§] 2, 29 U.S.C. [§] 1001, it would be incongruous for persons establishing or maintaining informal or unwritten employee benefit plans, or assuming the responsibility of safeguarding plan assets, to circumvent the Act merely because an administrator or other fiduciary failed to satisfy reporting or fiduciary standards.

The court need not rely on such an interpretation, however, because, as discussed below, ERISA's writing requirement, whatever its scope, does not apply to top hat plans.

24

ERISA."). Accordingly, Defendants' "Motion in Limine" Seeking Order that Plaintiffs' Claims [are] Barred by the Statute of Frauds is denied.

D.    Defendants' "Motion in Limine" Concerning Release of Defendants by Plaintiff Claps.

Defendants' fourth "motion in limine" argues that Plaintiff Claps' claims are barred by the release clause in his severance agreement with the bank. Defendants ask that Claps' claims be dismissed and that they be awarded reasonable costs and attorneys' fees incurred in defending against claims Claps knew were barred. Plaintiffs argue that defendants' motion is procedurally defective because it is an untimely motion to dismiss or for summary judgment and it asserts an affirmative defense not pled in defendants' answer. Plaintiffs also contend that the release does not constitute a valid waiver of Claps' ERISA benefits.

Release is an affirmative defense, see Fed.R.Civ.P. 8(c), which, if not pleaded, is generally deemed waived, see Conjugal Partnership v. Conjugal Partnership, 22 F.3d 391, 400 (1st Cir. 1994). "Nevertheless, it is settled that when there is no prejudice and when fairness dictates, the strictures of the raise or waive rule may be relaxed." Id. (internal quotation marks and brackets omitted). Defendants argue that there is no prejudice

25

here as Claps, having executed the release, knew of its existence. The position seems unworkable - it would obviate the need to plead release in most cases, as anyone who signs a release must usually be presumed to know, in the absence of fraudulent concealment of the nature of the document being executed, of its existence. Yet the argument also appeals to a sense of fairness, in that one who knowingly releases a claim for valid consideration should of course be held to his bargain.

Case precedent reflects the tension between protecting a litigant's ability to rely on the pleadings and the Federal Rules of Civil Procedure to determine what awaits him at trial on the one hand, and preventing a litigant who knows he has released his claim from exploiting a violation of procedural rules, on the other. Compare George R. Hall, Inc. v. Superior Trucking Co., Inc., 532 F. Supp. 985, 991 (N.D. Ga. 1982) (finding prejudice and stating that "[i]n the absence of any meaningful mention of release by [defendant], [cross-claimant] could rely on the absence of release from the case, and could forego any discovery or preparation to meet that defense with the security that any claims of release were precluded") with Havoco of America, Ltd. v. Hilco, Inc., 750 F. Supp. 946, 959 (N.D. Ill. 1990), aff'd sub nom. Havoco of America, Ltd. v. Sumitomo Corp. of America, 971 F.2d 1332 (7th Cir. 1992) (finding no prejudice where, inter

26

<u>alia</u>, Havoco had known of the release for fourteen years and "[i]f Havoco failed to anticipate that the defendants might raise the release as a defense at some point, Havoco has only itself to blame"). A number of factors in this case weigh in favor of barring the affirmative defense, including that it was not raised until the eve of trial and that defendants, as successors to the recipient of the release, can arguably be charged with knowledge of its existence as easily as can Claps.[12] Nevertheless, the court finds that Claps' obvious knowledge of the release belies any claim of prejudice. The court will not bar assertion of the defense due to failure to plead it in defendants' answer.

Plaintiffs argue that the defense must fail nonetheless because of the best evidence rule. That rule, as embodied in Federal Rule of Evidence 1002, requires that "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress." Plaintiffs argue that because the severance agreement containing the release was not introduced into evidence, but was merely read

---

[12]The release was eventually discovered in defendants' files. Defendants' counsel represented to the court that the release was difficult to find because of the changes in ownership of the bank, and that it was not discovered until the weekend prior to trial.

in part into the record by defense counsel, its contents may not be proven without violating the best evidence rule.

The court reserved ruling at trial on the admissibility of the severance agreement. Plaintiffs objected to its admission, and to testimony by Claps concerning it, on the basis that it had not been disclosed by defendants during discovery. Rule 37(c)(1) of the Federal Rules of Civil Procedure provides, in part, that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, unless such failure is harmless, be permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed." Rules 26(a) and 26(e)(1), in turn, require the disclosure, and the supplementation of any disclosure, of witnesses and exhibits expected to be used at trial and items requested through permitted methods of discovery.[13]

Defendants argue that the severance agreement was not within the scope of any of plaintiffs' discovery requests. Plaintiffs counter that the agreement is a "document[] relating in any way to the SERP first described to Plaintiffs in April 1988" sought

---

[13]Federal Rule of Civil Procedure 26(a)(1), requiring automatic initial disclosure of certain materials, is not in force in the District of New Hampshire. <u>See</u> Local Rules of the United States District Court for the District of New Hampshire 26.1(a).

28

in their first request for production of documents.  The court need not resolve this dispute, as the agreement is certainly an exhibit "the party expects to offer . . . [or] may offer [at trial] if the need arises."  Fed.R.Civ.P. 26(a)(3)(C).  Thus, under Fed.R.Civ.P. 26(a)(3)(C), defendants were required to provide plaintiffs with at least an identification of the severance agreement no fewer than thirty days before trial.  Having failed to do so, defendants are subject to Rule 37(c)(1) sanctions.

Plaintiffs rely on <u>Klonoski v. Mahlab</u>, 156 F.3d 255 (1st Cir. 1998), to support exclusion of the severance agreement.  In <u>Klonoski</u>, the First Circuit noted that Rule 37(c)(1) is "mandatory . . . and the required sanction in the ordinary case is mandatory preclusion."  <u>Id</u>. at 269.  Rule 37(c)(1) itself, however, contains two limitations on its application that were overlooked in <u>Klonoski</u>.

> Under Rule 37(c)(1), the court must first consider whether the party has established "substantial justification" for the failure to disclose and then consider whether the failure to disclose was "harmless."  Substantial justification requires justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request.  The proponent's position must have a reasonable basis in law and fact.  The test is satisfied if there exists a genuine dispute concerning compliance.  Failure to comply with the mandate of the Rule is harmless when there is no prejudice to the party entitled to the disclosure.  The burden of

29

> establishing substantial justification and harmlessness
> is upon the party who is claimed to have failed to make
> the required disclosure.

Nguyen v. IBP. Inc., 162 F.R.D. 675, 679-80 (D. Kan. 1995).

The only justification offered by defendants is that due to changes in ownership of the bank, they were unable to locate the release until the weekend before trial. The court in Klonoski noted, however, that "Rule 26 provides no exception for documents found after discovery deadlines have passed." Klonoski, 156 F.3d at 268. Moreover, defendants have not contended that the release was ever outside of their possession or control, or beyond their ability to recover. Rather, disruptions in record-keeping at the bank apparently made locating its own files difficult. That is not substantial justification. Cf. Lintz v. American Gen. Finance, Inc., 1999 WL 619045 at *6 (D. Kan. Aug. 2, 1999) ("That outside counsel and an in-house paralegal did not know of the existence of the documents [kept in an investigative file maintained by in-house counsel] until shortly before disclosing them provides insufficient justification to excuse the untimely disclosures.").

The second inquiry under Rule 37(c)(1) is whether the failure to disclose was harmless. The Advisory Committee Notes explain that limitations in the rule are designed "to avoid unduly harsh penalties" in situations such as "the inadvertent

30

omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties." Accordingly, as the Lintz court recognized, in cases of document production "harmlessness would also cover such situations as the inadvertent omission from disclosure of documents known to all parties." Id., 1999 WL 619045 at *6.

Defendants have consistently argued that Claps cannot have been prejudiced by their failure to produce the severance agreement when he testified that he remembered signing the agreement and had a copy of it in his files. (See Tr., 11/13/98, at 86.) The court agrees and finds that defendants' nondisclosure of the severance agreement was harmless. See Lintz, 1999 WL 619045 at *7 (finding nondisclosure harmless as to a plaintiff who "signed the document during her employment with defendants. She knew of its existence and could not have been surprised by its contents."); cf. Breitling U.S.A. Inc. v. Federal Express Corp., 45 F. Supp. 2d 179, 183 n.3 (D. Conn. 1999)(declining to exclude unproduced document from consideration under Rule 37(c)(1) when "[t]he plaintiff does not dispute the authenticity of the [document], nor does it claim that it was never provided with the document."); U.S. Axminster, Inc. v. Chamberlain, 176 F.R.D. 532, 534 (N.D. Miss. 1997)(finding no prejudice where, inter alia, defendant was informed of the

31

existence of the undisclosed agreement by the deposition testimony of plaintiff's president).  Thus, the severance agreement is admissible and plaintiffs' best evidence argument is moot.

Plaintiffs next argue that the severance agreement is not a valid waiver or release of Claps' rights under the SERP. Plaintiffs argue that the SERP is not mentioned in the severance agreement, that it was not discussed in the negotiations over the severance agreement, and that Claps could not have released his cause of action against the bank at the time he executed the severance agreement because it had not yet accrued.

The validity of a waiver or release of rights in a benefit plan covered by ERISA is governed by federal common law.  See Rodriguez-Abreu, 986 F.2d at 587.  "To be valid, a waiver of ERISA benefits must be an intentional relinquishment or abandonment of a known right or privilege."  Id.  In assessing validity, the First Circuit has found the following factors helpful, although not exclusive: "(1) plaintiff's education and business sophistication; (2) the respective roles of employer and employee in determining the provisions of the waiver; (3) the clarity of the agreement; (4) the time plaintiff had to study the agreement; (5) whether plaintiff had independent advice, such as that of counsel; and (6) the consideration for the waiver."

32

<u>Morais v. Central Beverage Corp. Union Employees' Supp.</u>
<u>Retirement Plan</u>, 167 F.3d 709, 713 n.6 (1st Cir. 1999).

Claps was, at the time he left the bank, president and chief executive officer of First NH Investment Services. His position involved "working with qualified plans, SERPs and whatnot." (Tr., 11/13/98, at 7.) Thus, Claps was a sophisticated executive, familiar with banking and business in general, and pension plans in particular. Claps also played an active role in fashioning the terms of his severance agreement. His testimony at trial confirmed that he met with L. Douglas O'Brien, president and CEO of the bank, and "engage[d] in give-and-take bargaining over the terms of [his] separation." (Tr., 11/13/98, at 63 (quoted language is a question by defense counsel).)

Although the severance agreement does not expressly refer to the SERP, its terms are unequivocal. It provides, in part:

> In exchange for the salary, benefits, and other
> consideration provided by this agreement, you agree to
> release Bank of Ireland First Holdings, Inc. and all of
> the employees, officers, directors, agents, successors,
> assigns, and corporate affiliates and subsidiaries of
> Bank of Ireland First Holdings, Inc. from any and all
> claims, demands and causes of action of any kind or
> nature, including but not limited to, claims of
> discrimination, wrongful discharge or breach of
> contract, whether known or unknown or suspected or
> unsuspected, which you now own or hold or have at any
> time before this owned or held against any of the
> above.

(Ex. A to Defs.' Mot. in Limine Concerning Release of Defs. by Pl. Claps., ¶ 15.) The agreement also states that it supersedes all prior agreements or understandings between the bank and Claps. It explicitly sets forth the terms under which Claps would continue to participate in identified bank benefit plans such as life, health and dental insurance, the Retirement Plan of Bank of Ireland First Holdings, Inc., and his 401(k) plan, but the SERP is not mentioned. Thus, the severance agreement unambiguously excludes Claps from further participation in the SERP. See Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 179 (1st Cir. 1995)(severance agreement that listed benefits plaintiff would receive but failed to mention long term disability benefits unambiguously excluded plaintiff from long term disability coverage). In addition, the scope of the release, which covers "any and all claims, demands and causes of action of any kind or nature," is broad enough to cover Claps' claim for benefits under the SERP.

No evidence was presented at trial as to how long Claps had to review the agreement or whether he consulted an attorney or other advisor. With respect to the last factor, the agreement indicates that Claps did receive valuable consideration for the release, including the continuation of his salary and car allowance for a year after termination of his employment, and

34

continued participation in certain bank benefit plans for a specified period of time.  Thus, factors 1, 2, 3 and 6 weigh in favor of the validity of the release and factors 4 and 5 are roughly neutral.

Claps also argues that under the terms the severance agreement, he could not release a cause of action that had not yet accrued at the time of the agreement's execution.  Although it has not been necessary, or possible, to determine precisely when plaintiffs' cause of action accrued, the court previously noted that it may have been as late as  November, 1996, in other words, after Claps executed the severance agreement.  Although plaintiffs do not cite authority directly on point, there is some support for their argument.  See Auslander v. Helfand, 988 F. Supp. 576, 581 (D. Md. 1997) (declining to grant summary judgment on the basis of a release that "unambiguously release[d] Defendants from claims arising before the date of the settlement agreement," where Defendants "failed to meet their burden of demonstrating that Plaintiff's [ERISA] claim accrued before the date of the settlement agreement").  However, more persuasive authority is contrary to plaintiffs' position.  Plaintiffs' argument erroneously employs a statute of limitations analysis to determine the scope of Claps' release.

> The problem with [plaintiffs'] argument is that it
> mixes up apples and oranges.  The statute of

35

> limitations starts to run when the plaintiff's cause of action accrues, and accrual occurs either when the plaintiff discovers, or should have discovered, that [he] has been injured. In release cases, the question is not when was the date of accrual, but rather whether the plaintiff is knowingly giving up the right to sue on some claims, or all claims that are in general terms predictable.

Wagner v. Nutrasweet Co., 95 F.3d 527, 533 (7th Cir. 1996) (citations omitted); see also Mississippi Power & Light Co., v. United Gas Pipe Line Co., 729 F. Supp. 504, 507 (S.D. Miss. 1989)(citing case for proposition that "whether a claim exists at the time of execution of a general release, for purposes of determining whether that claim has been released, is a very different question from whether a claim exists in the statute of limitations context").

Thus, whether or not a cause of action has accrued for statute of limitations purposes is not dispositive of whether a claim has been released. "A releasor may relieve the obligor of existing contractual duties and other obligations, even where those obligations have not yet come due and before a claim concerning a breach of those obligations has as yet arisen." Vitkus v. Beatrice Co., 11 F.3d 1535, 1540-41 (10th Cir. 1993)

This observation is bolstered by examining the language of the release itself. The agreement releases the bank and related parties "from any and all claims, demands and causes of action of any kind or nature . . . whether known or unknown or suspected or

36

unsuspected, which you now own or hold or have at any time before this owned or held." (Ex. A to Defs.' Motion in Limine Concerning Release of Defendants by Plaintiff Claps.) The inclusion of the terms "claims" and "demands" in addition to "causes of action" indicates that the parties intended the release to cover more than accrued causes of action. See Vitkus, 11 F.3d at 1540 (release covered not only causes of action but "existing 'financial obligations"); Mississippi Power, 729 F. Supp. at 507 ("The terms used in the release - 'obligations, demands, rights, claims, right of action, remedies' - clearly evidence an intent to cover something broader than a mere cause of action.").

Where the release covers "claims" in a broader sense than "causes of action," and the relevant question is whether the maker of the release has knowingly and voluntarily waived such a claim, "the critical inquiry is whether the claim or right can be said to exist such that a party is capable of waiving it or preserving it." Mississippi Power, 729 F. Supp. at 508. In other words, the question is whether the claim is one "whose facts were well enough known for the maker of the release to frame a general description of it and request an explicit reservation." Johnson, Drake and Piper, Inc. v. United States, 531 F.2d 1037, 1047 (Ct. Cl. 1976).

That test is plainly met in this case.  Claps obviously knew at the time he negotiated and signed the release that whether he would receive benefits under the SERP if he left the bank prior to retirement was a matter of ongoing dispute.  At trial he conceded that he knew the matter was "an issue on the table" at the time he left the bank.  (Tr., 11/13/98 at 62.)  Claps could easily have negotiated an exclusion from the release of any claim or right he had in the SERP, or could have refused to execute the release at all if no exclusion were granted and the matter was of sufficient importance to him.  Defendants' "Motion in Limine" Concerning Release of Defendants by Plaintiff Claps is granted to the extent that it seeks dismissal of all Claps' SERP claims.

Defendants' motion also seeks an award of costs and attorneys fees incurred by defendants in defending against Claps' released claims.  The court declines to order such an award.  Claps' argument that the release did not apply to his unaccrued ERISA claim was not frivolous.  Moreover, defendants could have saved themselves virtually all of the costs of litigation had they simply paid attention to this case at its inception, located the release in their own files, and filed a timely dispositive motion.

E.   Defendants' "Motion in Limine" Concerning Attorneys' Fees Not Pled.

Defendants' next "motion in limine" seeks to preclude plaintiffs from recovering attorneys' fees under 29 U.S.C. § 1132(g) because they failed to plead a request for attorneys' fees in their complaint.  (Defendants fail to cite any authority supporting their motion.)

Courts have split on whether a request for attorneys' fees must be contained in a party's pleadings.  See generally, Rural Telephone Serv. Co., Inc. v. Feist Publications, Inc., 1992 WL 160890 (D. Kan. June 18, 1992)(collecting cases).  One line of cases holds that "[c]laims for attorney fees are items of special damage which must be specifically pleaded under Federal Rule of Civil Procedure 9(g).  In the absence of allegations that the pleader is entitled to attorney's fees, therefore, such fees cannot be awarded."  Maidmore Realty Co., Inc. v. Maidmore Realty Co, Inc., 474 F.2d 840 (3d Cir. 1973); see also United Indus., Inc. v. Simon-Hartley, Ltd., 91 F.3d 762, 765 (5th Cir. 1996)(citing cases that require attorneys' fees to be specifically pled under Fed.R.Civ.P. 9(g) and stating that "[a]s a general rule, . . . we find nothing inappropriate with requiring a party to put its adversaries on notice that attorneys' fees are at issue in a timely fashion or waive that claim."); In re American Cas. Co., 851 F.2d 794, 802 (6th Cir.

39

1988)(noting that attorneys' fees are items of special damage that must be specifically pled); <u>Atlantic Purchasers, Inc. v. Aircraft Sales, Inc.</u>, 705 F.2d 712, 716 n.4 (4th Cir. 1983)(same); <u>Western Cas. and Sur. Co. v. Southwestern Bell Tel. Co.</u>, 396 F.2d 351, 356 (8th Cir. 1968)(same).

A second line of cases holds that Fed.R.Civ.P. 54(c) allows recovery of attorneys' fees even if a claim for them has not been pled. <u>See</u> <u>Thorstenn v. Barnard</u>, 883 F.2d 217, 218 (3d Cir. 1989); <u>Engel v. Teleprompter Corp.</u>, 732 F.2d 1238, 1240-41 (5th Cir. 1984); <u>Klarman v. Santini</u>, 503 F.2d 29, 36 (2d Cir. 1974); <u>Paliaga v. Luckenbach S.S. Co.</u>, 301 F.2d 403, 410 (2d Cir. 1962). Rule 54(c) provides in part that "[e]very final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." Although Rule 54(c) contains no express limitation, some courts have restricted its application to situations in which the opposing party will not be prejudiced. <u>See</u>, <u>e.g.</u>, <u>Engel</u>, 732 F.2d at 1242.

Attempts to reconcile or distinguish these cases have been varied, and the First Circuit does not appear to have addressed the issue at all. The court in <u>Atchison Casting Corp. v. Dofasco</u>, 1995 WL 655183, at *5 (D. Kan. Oct. 24, 1995), however, noted that "[t]he cases citing Rule 54(c) have a common thread:

40

fees may be awarded where the parties to the action knew or should have known an attorneys' fees award could issue." ERISA unmistakably provides for an award of attorneys' fees and defendants have known from the inception of this action that plaintiffs were asserting ERISA claims, at least in the alternative. Moreover, plaintiffs asserted a claim for attorneys' fees in their pretrial statement, filed on September 9, 1998, more than a month before trial. Thus, defendants knew or should have known that plaintiffs could be awarded attorneys' fees, or, expressing the same conclusion in terms used in Marshall v. New Kids On The Block Partnership, 1993 WL 350063, at *1 (S.D.N.Y. Sept. 8, 1993), and Rural Telephone Serv. Co., 1992 WL 160890, at *1, allowing plaintiffs to advance a claim for attorneys fees will not prejudice the defendants. Cf. Credit Managers Ass'n of So. Cal. v. Kennesaw Life and Accident Ins. Co., 25 F.3d 743, 747 (9th Cir. 1994)(finding, without discussing either Fed.R.Civ.P. 9(g) or Fed.R.Civ.P. 54(c), that the district court properly considered an ERISA defendant's claim for attorneys' fees not pled in its answer where, inter alia, the "pretrial conference order . . . put CMA on notice that Kennesaw intended to seek fees if it prevailed at trial"). Accordingly, plaintiffs will not be barred from asserting a claim for

41

attorneys' fees. Defendants' Motion in Limine Concerning Attorneys' Fees Not Pled is denied.

F. <u>Defendants' Motion in Limine Concerning Hearsay</u>.

Defendants' next motion in limine seeks to exclude, as inadmissable hearsay, statements about the terms of the SERP made by DeAngelis and Buhl at the April 1988 meeting. <u>See</u> Fed.R.Evid. 801. Such statements are not hearsay. DeAngelis and Buhl were particularly high-level officers of the bank (DeAngelis had primary responsibility for developing and presenting the SERP plan) and were authorized to describe the terms of the SERP at the April 1988 meeting. Thus, their statements are offered against the bank and are "statement[s] by the [bank's] agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed.R.Evid. 801(d)(2)(D). Defendants' Motion in Limine Concerning Hearsay is denied.

G. <u>Defendants' Motion to Amend Answer</u>.

Defendants have also moved to amend their answer to plead the affirmative defenses of statute of limitations and release. Defendants' ability to assert these affirmative defenses is discussed above in connection with the merits of the defenses.

42

Consistently with the court's rulings above, defendants' motion is granted in part and denied in part: defendants' motion to amend their answer to plead the defense of release is granted, but the motion is denied as to the statute of limitations defense.

H.    Defendants' Motion to Supplement Pretrial Statement.

Defendants seek leave to supplement their pretrial statement to substitute JoAnn Swift for Wallace Demary as Keeper of the Records of the bank and to add six exhibits, numbered 12 through 17.  Plaintiffs point out that Ms. Swift was not called to testify at trial and that defendants did not seek to introduce their exhibits numbered 13 through 17.  Plaintiffs represent that Defendants' exhibit 12 was admitted for a limited purpose by the parties' agreement.  Thus, plaintiffs argue, defendants' motion is moot and sanctions should be imposed for defendants' refusal to withdraw the motion.

The court agrees that whether Ms. Swift's name should be added to the pretrial statement is moot.  However, the supplemental pretrial statement also lists Claps' release as an exhibit, which the court has held admissible.  Thus, to be scrupulous, defendants' pretrial statement is deemed amended to at least list the release.  See L.R.16.2 (b)(7)(requiring that a

43

final pretrial statement contain "a list of all exhibits to be offered at trial"). Defendants' Motion to Supplement Pretrial Statement is denied as to listing Ms. Swift and granted as to listing the release and any other exhibits actually admitted at trial.

I. Defendants' Motion to Allow Admission of Privileged Document.

Defendants' final motion seeks admission of a document defendants withheld during discovery on the basis of attorney-client privilege, but later, upon realizing that the privilege did not apply, turned over to plaintiffs. Plaintiffs object, and ask that they be awarded reasonable attorneys' fees incurred in responding to the motion, as defendants refused to withdraw it even after the court sustained plaintiffs' objection to the use of the document at trial. (See Tr., 11/12/98, morning, at 59.) As ruled from the bench at trial, defendants' motion is denied. The parties will bear their own fees related to the motion.

II. Decision on the Merits

Having ruled on all pending motions, focus now turns to the merits. Plaintiff Lund (Claps' claims are dismissed) argues that the bank's SERP presentation to participants at the April, 1988, meeting constituted an offer, and he accepted by continuing to

44

work for the bank for the specified time period, thereby forming a binding unilateral contract.  See, e.g., Kemmerer v. ICI Americas Inc., 70 F.3d 281, 287 (3d Cir. 1995)(internal quotation marks omitted)("A pension plan is a unilateral contract which creates a vested right in those employees who accept the offer it contains by continuing in employment for the requisite number of years.").  Defendants disagree, saying that the presentation was not a definite offer, but merely a statement of the bank's intent to create a SERP at some point in the future.  Thus, there was nothing for plaintiff to accept and no unilateral contract could be or was formed.  Cf. Elmore v. Cone Mills Corp., 23 F.3d 855, 862 (4th Cir. 1994)(en banc)(letters sent to employees to keep them "apprised of the proposed developments in their pension plans" in connection with a leveraged buy-out of the employer were "merely preliminary statements of [the employer's] intentions regarding the plan and do not constitute an enforceable plan"); Carver v. Westinghouse Hanford Co., 951 F.2d 1083, 1087 (9th Cir. 1991)(no ERISA plan created by documents designed to "apprise anxious employees of what they might expect once the transition from several employers to [the consolidated employer] was completed").

The Court of Appeals for this circuit has noted that "a 'plan, fund or program' under ERISA is established if from the

surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." Wickman v. Northwestern Nat'l Ins. Co., 908 F.2d 1077, 1082 (1st Cir. 1990)(quoting Donovan, 688 F.2d at 1373)(internal quotation marks omitted). The SERP here meets those requirements. At the April, 1988, meeting, DeAngelis described the SERP's terms in detail. In fact, DeAngelis unequivocally confirmed at trial that from the description he gave at the meeting, a participant who knew his salary, defined benefit, social security benefit and any other pension benefit available to him could calculate the benefit he would receive under the SERP. (Tr., 11/12/98, afternoon, at 99.) DeAngelis also told the invited attendees who the class of persons eligible to participate in the SERP were. (Tr., 11/12/98, afternoon, at 79). In addition, he told the attendees that the plan was to be unfunded, so the source of funding would be the bank's general revenues and/or assets. (Tr., 11/12/98, morning, at 18 (testimony of Mr. Lund).)

The final requirement is that procedures for obtaining benefits be ascertainable from the surrounding circumstances. Although there is no evidence that claims procedures were specifically discussed at the meeting, DeAngelis testified that the SERP was intended to be a "mirror plan" to the bank's

46

qualified retirement plan and that he communicated that to the attendees. (Tr., 11/12/98, afternoon, at 54-55.) Thus, the procedure for obtaining benefits could be determined as well, by reference to the bank's qualified plan. (See Pls.' Ex. 21, Summary Plan Description, dated May 1, 1988, describing plan adopted on January 1, 1985, and containing section entitled "How to Apply for Benefits.") This case, therefore, differs from Elmore, 23 F.3d at 862, in which the purported plan failed the Donovan test because "[t]he only way an employee could ascertain the procedures for obtaining benefits would be to refer to the 1983 [employee stock ownership plan] formal plan document, which was not adopted until" after the representations regarding the purported plan were made. The court finds that under the Donovan test, adopted by the First Circuit in Wickman, the SERP described and offered to plaintiff in April, 1988, was definite enough to constitute an ERISA plan.

Defendants also argue that they cannot be bound by an oral SERP offered to plaintiff in April, 1988, because all parties knew that the SERP was eventually going to be embodied in a formal written document. Defendants rely on Gel Sys. v. Hyundai Eng'g & Constr. Co., 902 F.2d 1024, 1027 (1st Cir. 1990), in which the First Circuit noted that under Massachusetts law, "the fact that a writing specifically contemplates the future

47

execution of a formal contract gives rise to a 'strong inference' that the parties do not intend to be bound until the formal document is hammered out."  The Gel Systems court also recognized, however, that reference to later execution of a formal document does not automatically compel the conclusion that the initial agreement is not binding.  Id.  The court noted that "[i]f all material terms which are to be incorporated into a future writing have been agreed upon, it may be inferred that the writing to be drafted and delivered is a mere memorial of the contract already final by the earlier mutual assent of the parties to those terms."  Id. at 1027-28 (internal quotation marks omitted).

As described above, the terms of the SERP were related to plaintiff in detail - there was nothing more for the parties to "hammer[] out."  Id. at 1027.  Thus, the court concludes that the contemplated formal document was intended to merely memorialize the already-binding agreement entered into at the meeting.  This conclusion is supported by DeAngelis' testimony in response to the following question put by the court: "From your perspective, when you left that room [i.e. the April, 1988, meeting], did the people in that room have a reasonable expectation that there was a plan, they were going to be participating in it, and the plan as described would be as you described it to them?"  (Tr.,

11/12/98, afternoon, at 59.) DeAngelis answered: "Sure. I had a reasonable expectation, your Honor. I was a participant in that plan." (Id. at 59-60.)

Defendants next argue that even if a SERP was created by the acceptance of the bank's oral offer at the April, 1988, meeting, that SERP was revoked and superseded by the subsequent 1987 written document describing a SERP with different terms. Defendants cite the "general rule" that top hat plans may be freely amended. See Amatuzio v. Gandalf Sys. Corp., 994 F. Supp. 253, 265 (D.N.J. 1998)("As a general rule, welfare plans such as severance plans may be freely amended or canceled at any time."); Carr v. First Nationwide Bank, 816 F. Supp. 1476, 1489 (N.D. Cal. 1993)(noting that rules governing top hat and welfare benefit plans are essentially the same with respect to amendment or termination of a plan). That general rule, however, merely recognizes that ERISA's fiduciary duty standards do not apply to the amendment or termination of a top hat or welfare benefit plan. Carr, 816 F. Supp. at 1489. Amendment or termination may nevertheless be precluded by the plan itself, interpreted under general contract law principles. See id.; Kemmerer, 70 F.3d at 288.

A top hat plan is a unilateral contract "formed when an employee accepts the employer's offer by performing the requisite

49

number of years of performance." <u>Benham v. Lenox Sav. Bank</u>, 26 F. Supp. 2d 231, 238-39 (D. Mass. 1998). Once that performance has been completed, the employer cannot terminate or amend the plan unless it has explicitly reserved the right to terminate or amend after performance. <u>See</u> <u>Kemmerer</u>, 70 F.3d at 287-88; <u>In re New Valley</u>, 89 F.3d at 151.

Defendants argue that the bank amended the plan prior to the plaintiff's completion of performance. Specifically, they argue that the SERP was amended no later than February, 1989, when Attorney Cleveland delivered a draft plan document to DeAngelis. The court disagrees. First, defendants have failed to prove that the SERP described in the 1987 document was ever established by the bank's board of directors. Moreover, even if the 1987 written SERP had been established, it was never disclosed to plaintiff until 1993, after he had completed ten years of service with the bank. Plaintiff attempted, with reasonable diligence, to obtain a written description of the SERP, but he was repeatedly told that it had not yet been completed. The court, therefore, holds that the bank did not, by its unilateral action - action not communicated to plaintiff - effectively amend the SERP as to Plaintiff Lund prior to his having vested. <u>See</u> <u>Bartlett</u>, 38 F.3d at 517 (approving district court's holding that

employee "could not be bound to terms of the policy of which he had no notice").

Even if plaintiff could not enforce the SERP as a contract, he would prevail under an estoppel theory. As noted above, the First Circuit has not yet decided whether to recognize an estoppel theory under ERISA. See City of Hope Nat'l Med. Ctr., 156 F.3d at 230 n.9. Other courts, however, have recognized ERISA estoppel claims under varying circumstances. See generally Black v. TIC Inv. Corp., 900 F.2d 112, 114-15 (7th Cir. 1990)(collecting cases). The court finds estoppel principles particularly applicable in this case, which does not involve any of the concerns that might militate against recognizing estoppel in ERISA cases, namely, risk of impairment of the actuarial soundness of a plan (the plan here is unfunded), see id. at 115 (allowing estoppel claim against an unfunded, single-employer, welfare benefit plan because "there is no need for concern about the Plan's actuarial soundness"), or using oral representations to modify the terms of a written plan (here the oral representations predated any written version of a plan), see Elmore, 23 F.3d at 869 (Murnaghan, J., concurring)(advocating recognition of estoppel principles where oral contract existed before the written plan).

Defendants argue that plaintiff nevertheless fails to meet two of the elements of estoppel. First, defendants contend that the representations made here were of future intentions, not present fact, and therefore do not support an estoppel claim. The court disagrees. Defendants rely on DeAngelis' testimony that at the time of the April, 1988, meeting there was not yet a SERP plan in place. While that testimony was somewhat ambiguous - he seemed to be referring to a formal, final, written plan - his testimony nevertheless established that in announcing the SERP to the invited executives, he was communicating that a presently-existing benefit was being conferred. (See Tr., 11/12/98, afternoon, at 60.) And, there was an obvious reason to do so in that fashion - the bank was particularly interested in making sure that its cadre of senior executives did not leave precipitously while the Bank of Ireland proceeded with its takeover.

Moreover, defendants' argument assumes the strict application of equitable estoppel. Courts have not been clear whether the doctrine applicable in circumstances such as those present here is equitable or promissory estoppel. See generally Elmore, 23 F.3d at 867 n.5 (Murnaghan, J. concurring). The primary difference is the nature of the statement inducing reliance: "equitable estoppel depends on a misrepresentation of

52

an existing fact, while promissory estoppel requires a promise concerning future intent." Cossack v. Burns, 970 F. Supp. 108, 117 (N.D.N.Y. 1997)(internal quotation marks and brackets omitted). Otherwise, the doctrines are similar. See Phelps v. Federal Emergency Management Agency, 785 F.2d 13, 16 (1st Cir. 1986)(Equitable estoppel applies where "one person makes a definite misrepresentation of fact to another person having reason to believe that the other will rely upon it and the other in reasonable reliance upon it acts to his or her detriment."(internal quotation marks omitted)); Santoni v. Federal Deposit Ins. Corp., 677 F.2d 174, 178 (1st Cir. 1982)(Doctrine of promissory estoppel provides that "[a] promise which the promissor should reasonably expect to induce action or forebearance on the part of the promissee or a third person and which does induce such action or forebearance is binding if injustice can be avoided only by enforcement of the promise."(internal quotation marks omitted)).

The court finds that even if DeAngelis' description of the SERP should be viewed as a statement of planned future action rather than of existing fact, it was a sufficiently detailed promise, intended to and certainly likely to induce action in reliance by the invited executives, to be enforced under the doctrine of promissory estoppel. See Santoni, 677 F.2d at 179

53

(noting that the "promise must be definite and certain so that the promissor should reasonably foresee that it will induce reliance by the promissee or a third party").

Defendants next argue that plaintiff's estoppel claim fails because any reliance on DeAngelis' statements was unreasonable where plaintiff knew the SERP was to be embodied in a written document. Defendants rely on Amatuzio for the proposition that if employees "know a written plan exists, then it is incumbent upon them to ascertain their rights under that plan and per se unreasonable to rely on any oral representations at odds with its written terms." Amatuzio, 944 F. Supp. at 269. The problem with that argument is that while plaintiff undoubtedly knew and expected that a written plan would be prepared, he reasonably expected that the written plan would be true to the bank's oral representation, and he did not know of any written document purporting to describe the plan until after he had vested under the oral plan (despite reasonable efforts to get a copy). In fact, when plaintiff sought to obtain a copy of the written plan, he was told that one did not exist, in that it had not yet been finalized. Thus, plaintiff's situation is more accurately described in the passage in Amatuzio immediately following that cited by defendants: "But if employees do not know that a written plan document exists, and they negotiate for contractually vested

54

benefits, then the employer will not be able to repudiate the contract later by bringing to light a previously undisclosed contractual disclaimer." Amatuzio, 994 F. Supp. at 269; see also Lipscomb v. Transac, Inc., 749 F. Supp. 1128, 1135 (N.D. Ga. 1990)("While an employer may rely upon a written plan to protect itself from oral modifications and amendments, its agents may not, before producing a written plan, make false representations to employees with regard to coverage, and only after a claim is filed or a relevant event occurs rely upon a later-composed, conveniently inconsistent version of the 'plan' to deny benefits to employees.").

The court finds that the bank either represented that the SERP described at the April, 1988, meeting existed, or, promised that it would be created in the future. The bank expected plaintiff to rely on those representations or promises and plaintiff did reasonably rely by continuing to work for the bank through the Bank of Ireland acquisition and for the requisite number of years, and by foregoing other opportunities. Plaintiff will be injured by loss of vested SERP benefits. Thus, plaintiff satisfies the elements of estoppel, whether articulated as equitable or promissory.[14]

---

[14]Some courts also require the existence of "extraordinary circumstances" to create an estoppel under ERISA. See, e.g., Amatuzio, 994 F. Supp. at 271. To the extent such a requirement

III. Attorneys' Fees

Under ERISA, the court, in its discretion, may award reasonable attorneys' fees and costs to the prevailing party. See Cottrill v. Sparrow, Johnson & Ursillo, Inc., 100 F.3d 220, 225 (1st Cir. 1996); 29 U.S.C.A. § 1132(g)(1)(West 1999). Merely prevailing on an ERISA claim does not, however, under First Circuit precedent, raise a presumption of entitlement to an award of fees. See Cottrill, 100 F.3d at 226. Rather, the court should consider the following factors:

> (1) the degree of culpability or bad faith attributable to the losing party; (2) the depth of the losing party's pocket, i.e., his or her capacity to pay an award; (3) the extent (if at all) to which such an award would deter other persons acting under similar circumstances; (4) the benefit (if any) that the successful suit confers on plan participants or beneficiaries generally; and (5) the relative merit of the parties' positions.

Id. at 225. The list is not exclusive, however. Id.

---

may exist here, the court finds that it is satisfied. The representations regarding the SERP were made at the time the bank's executives were informed of the impending acquisition by Bank of Ireland, and were expressly made for the purpose of inducing the executives to stay with the bank through the acquisition, in order to facilitate that acquisition on advantageous terms. Such circumstances are sufficiently extraordinary. See id. at 273 (finding extraordinary circumstances "in light of the number and scope of layoffs occurring in the relevant time period and the obvious need for plaintiffs to have accurate and complete information about their severance packages as they faced prospective unemployment").

Considering the referenced factors, an award of attorneys' fees and costs to Plaintiff Lund is appropriate. The evidence establishes that the bank, through Ms. McArdle, knew in 1993 that DeAngelis' own recollection of his description of the terms of the SERP to invited attendees of the April, 1988, meeting matched that of the plaintiffs. (See Pls.' Ex. 13.) While not necessarily indicating bad faith on the successor bank's part, that circumstance enhances the bank's culpability in denying Lund's eligibility under the SERP, and highlights the greater merit of Lund's position in this suit. The bank of course has the financial capacity to pay the award, and the award will deter other employers from making and breaking oral promises regarding ERISA benefits as part of an effort to keep critical executives in place while advantageous takeovers are impending.

As the SERP had few participants, the benefit, if any, that Plaintiff Lund's success will confer on others is probably limited. Nevertheless, that factor is easily outweighed by the other four. The court finds that Plaintiff Lund is entitled to recover his reasonable attorneys' fees and costs of this action.

## Conclusion

The result in this case essentially turns on a finding of credibility. The only evidence as to what was said at the April

57

26, 1988, meeting was the testimony of Lund, Claps, DeAngelis and Kirk. Their accounts were consistent and, particularly when corroborated by each other, credible. The only other attendees of the meeting who testified - Buhl and plan participant Bradford Guile - had very little memory of the meeting. There was conflicting testimony as to what form of SERP the bank's board of directors actually did, or intended to, adopt, although the court notes the absence of testimony from persons who could have shed light on that issue, such as Attorney Kimon Zachos, who actually presented the original concept or design to the board, and other board members. Nevertheless, what plan the board intended to establish, and whether it actually did so, are questions not particularly relevant under these circumstances. An authorized agent of the bank who had actual and apparent authority, communicated the bank's offer of a SERP to plaintiff, describing its terms in a manner about which there is no credible dispute. Plaintiff accepted and reasonably relied on the offer, and completed his performance under the contract. He is, therefore, entitled to have the terms of that contract - the terms that were presented to him - enforced.

The following motions are denied: Defendants' Motion in Limine Concerning Statute of Limitations (document no. 53); Defendants' Motion in Limine Concerning Equitable Estoppel Claims

58

Not Pled (document no. 54); Defendants' Motion in Limine Seeking Order that Plaintiffs' Claims [are] Barred by the Statute of Frauds (document no. 55); Defendants' Motion in Limine Concerning Attorneys' Fees Not Pled (document no. 57); Defendants' Motion in Limine Concerning Hearsay (document no. 58); Defendants' Motion to Allow Admission of Privileged Document (document no. 66).

Defendants' Motion in Limine Concerning Release of Defendants by Plaintiff Claps (document no. 56) is granted to the extent that it seeks dismissal of all Plaintiff Claps' claims and denied to the extent it seeks an award of attorneys' fees and costs. Defendants' Motion to Amend Answer (document no. 59) is granted as to pleading the defense of release and denied as to pleading the statute of limitations. Defendants' Motion to Supplement Pretrial Statement (document no. 61) is denied as to listing Ms. Swift and granted as to listing the release and any other exhibits actually admitted at trial.

The court holds that Plaintiff Lund is entitled to relief, in the form of a declaratory judgment, under contract and estoppel principles. At such time as Plaintiff Lund retires,[15] he will be entitled to receive SERP benefits under the terms the court has found were orally described to him by DeAngelis in

---

[15]Plaintiff Lund has already reached the eligible age for early retirement.

59

April of 1988. Plaintiff Lund is also entitled to recover his reasonable attorneys fees and costs of this action. As explained above, Plaintiff Claps is not entitled to benefits under the oral SERP as he released his claims to such benefits in his severance agreement.

The foregoing shall constitute the court's findings of fact and conclusions of law required by Fed.R.Civ.P. 52; any requests for findings or rulings not expressly or impliedly granted in this order are hereby denied. See Applewood Landscape & Nursery Co., Inc. v. Hollingsworth, 884 F.2d 1502, 1503 (1st Cir. 1989); Morgan v. Kerrigan, 509 F.2d 580, 588 n.14 (1st Cir. 1974). The clerk is instructed to enter judgment on the merits in favor of Plaintiff Lund against Defendants Citizens Financial Group Inc. and Citizens Bank New Hampshire. Plaintiff Claps' claims against Defendants Citizens Financial Group Inc. and Citizens Bank New Hampshire are dismissed. If the parties are unable to agree on reasonable attorneys' fees and costs to which Lund is entitled, plaintiff shall submit a well-supported claim for attorneys' fees and costs within 30 days of the date of this order. Any objection to plaintiff's claim for fees and costs shall be filed within 30 days after the claim is filed.

**SO ORDERED.**

                                            _____
                                            Steven J. McAuliffe
                                            United States District Judge

September 30, 1999

cc:   Hamilton R. Krans, Jr., Esq.
       Richard L. O'Meara, Esq.
       Michael D. Traister, Esq.
       Kevin M. Fitzgerald, Esq.